[No. 17309-7-III.   Division Three.   November 23, 1999.]

ROBERT CARLSON, ET AL., *Respondents*, v. LOREN K. SHARP, ET AL., *Defendants*, STRATA, INC., *Appellant.*

*Henry E. Stiles II* and *Erika Balazs* of *Lukins & Annis, P.S.*, for appellant.

*John G. Schultz* of *Leavy, Schultz, Davis & Fearing, P.S.*, for respondents.

KURTZ, A.C.J. — Strata, Inc., a geotechnical engineering firm, was hired by Loren Sharp, a developer, to analyze the suitability of the soil on several lots in a development in Kennewick, Washington. Strata produced a report indicating the lots were suitable for manufactured homes, with certain restrictions on the placement of the homes within the lots. The lots were sold and homes were placed on them. Two of the lots began to sink and the homes experienced significant damages from the settling. The homeowners sued Mr. Sharp and Strata. After a bench trial, the court found Strata was negligent in its soil analysis and awarded each homeowner a judgment against it for the cost of various repairs to the homes, plus up to $70,000 to remove and replace the fill dirt with properly compacted soil. Strata appeals, contending the doctrine of economic loss prohibits recovery of contract damages under a tort theory, the plaintiffs failed to prove proximate cause, and the damage award was in error. We conclude the trial court erred by awarding damages to the homeowners because the damages claimed are economic and the economic loss rule prevents recovery under tort.

## FACTS

Loren Sharp was the developer and contractor of Willow

Ridge subdivision, a mobile home park. Several lots in the development needed fill dirt to support a structure on the lot. The two lots that are the subject of this suit both required fill dirt. After the fill was deposited, the City of Kennewick required geotechnical testing on the lots. Strata agreed to perform compaction testing and geotechnical studies of the fill.

After Strata completed its tests, it produced a report for Mr. Sharp. A cover letter accompanying the report stated, "[b]ased on the results of this evaluation, it is our opinion that the site is suitable for the proposed development." Within the report, Strata recommended:

> However, our observations at the site indicate that fill materials along the fill slope and top of the slope area are likely not compacted to the criteria for a structural fill, as evidenced by tension cracks and loose surface soil at the slope face. In general, we are of the opinion that the foundation soils for the mobile homes, from 40 to 68 feet back from the curb line, are suitable for support of the structures. However, structures should not be located within 30 feet of the top of fill slope, or outside a 2:1 (horizontal to vertical) imaginary line drawn up from the toe of the fill slope.

Mr. Sharp submitted the report to the City and the development was approved.

Mr. Sharp installed a mobile home on one of the lots for Jeffrey and Dana Reeder. After installation, it was discovered that the home encroached on an easement and it was later moved. Consequently, the Reeders' home was not placed strictly within the area 40 to 68 feet back from the curb line. Among other problems, the Reeders' home has had nails pop out of the walls and its stairs have settled.

Mr. Sharp also installed a mobile home on one of the lots for Robert and Wendy Carlson. He worked with the Carlsons to stake their foundation. Before pouring the foundation, the City issued an order to stop work so that further compaction studies could be conducted on the Carlsons' lot. Intermountain Materials Testing, Inc., conducted an additional study of the Carlsons' lot, and the City then al-

lowed the project to proceed. Mr. Sharp poured the foundation and the house was placed on the lot.

Problems began at the Carlsons' lot after the first winter. The back steps pulled away from the house and the patio sank. Some of the footings settled and sheetrock in the house cracked, along with other damage.

Procedural History. The Reeders and Carlsons filed separate suits against the City of Kennewick and Loren Sharp. The cases were consolidated. Mr. Sharp then filed a third-party complaint against Strata. The Reeders and Carlsons amended their complaints to also include claims against Strata.

The City of Kennewick moved for summary judgment based on the public duty doctrine. The court granted the motion as against the Carlsons, but not the Reeders. Next, Strata moved to dismiss the third-party claims and the plaintiffs' claims because they were based on tort and the economic loss rule prevented recovery. The court denied the motion.

Mr. Sharp filed for bankruptcy protection. The Carlson-Reeder case proceeded with claims against Strata and the Reeders pursued their case against the City of Kennewick.

Following a bench trial, the court awarded damages to the Carlsons and Reeders for their claims against Strata. The court found that Strata was negligent in concluding the sites were suitable for homes and was negligent in the phrasing of its report. The Carlsons were awarded $45,334.01 for repairs, and the Reeders were awarded $43,517.50. These amounts included an award to each party of $5,000 for their respective costs in having a second geotechnical engineer, Brian Williams, evaluate the lots. Mr. Williams testified at trial regarding the standard of care and Strata's negligence. Additionally, both parties were awarded "up to $70,000.00" for removing and replacing the fill dirt on their respective lots.

The Reeders did not prevail against the City of Ken-

newick. Strata filed a motion for reconsideration that was denied. Strata appealed.

## ANALYSIS

■ Strata contends that the economic loss rule prevents the Carlsons and Reeders from recovering because they seek purely economic damages using a tort claim. The economic loss rule is described as marking "the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 821, 881 P.2d 986 (1994). This rule was developed to prevent disproportionate liability and allow parties to allocate risk by contract. *Id.* at 822.

"Economic loss is a conceptual device used to classify damages for which a remedy in tort or contract is deemed permissible, but are more properly remediable only in contract." *Id.* In other words, " 'economic loss describes those damages falling on the contract side of "the line between tort and contract." ' " *Id.* (quoting *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 861 n.10, 774 P.2d 1199, 779 P.2d 697 (1989)). Economic loss is distinguished from physical harm or property damage. *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wn.2d 406, 420, 745 P.2d 1284 (1987). The distinction is drawn depending upon the nature of the defect and the manner in which the damage occurred. *Id.*

Tort law has traditionally redressed injuries properly classified as physical harm, and is concerned with the obligations imposed by law, rather than by bargain. *Id.* By contrast, contract law protects expectation interests, and provides an appropriate set of rules when an individual bargains for a product of particular quality for a particular use. *Id.* One court described the difference as "defects in materials evidenced by deterioration are characterized as economic losses, for which claims sounding in tort are

barred; defects causing physical injury or harm to other objects are not characterized as economic losses, and actions for such damage are not barred by the rule." *Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 213, 969 P.2d 486 (1998), *review denied*, 137 Wn.2d 1034 (1999).

██ ██ The Washington Supreme Court has not decided which of two tests is preferable in characterizing a loss: the risk of harm "sudden and dangerous test" or the "evaluative approach." *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992). The "sudden and dangerous test" distinguishes economic losses from other damages according to the manner in which the product failure occurred. "If the failure is the result of a sudden and dangerous event, it is remediable under tort principles." *Id.* Under the "evaluative approach," the court examines interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. "These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of contract law is most applicable to the claim in question." *Id.* at 351-52.

In *Berschauer*, the general contractor of a project sought recovery of losses incurred as a result of construction delays. The contractor sued the architect and the structural engineer on the project, claiming the plans were inaccurate and incomplete. The architect and engineer were both dismissed from the case on summary judgment because the economic loss rule prevented recovery for the tort claims. *Berschauer*, 124 Wn.2d at 820-21. On appeal, the court held that the economic loss rule does not allow a general contractor to recover purely economic damages in tort from a design professional. *Id.* at 823.

In *Stuart*, several condominium owners sued the builder-vendor for negligent construction of defective decks and walkways. The *Berschauer* court noted that because the *Stuart* plaintiffs suffered neither personal injury nor physical damage, the claims were deemed purely economic. *Berschauer*, 124 Wn.2d at 825. The *Stuart* court held that

Washington does not recognize a cause of action for negligent construction on behalf of individual homeowners. *Stuart*, 109 Wn.2d at 417.

In this case, the damage was not caused by a defective product but by an allegedly defective service. Our courts have shown a reluctance to allow homeowners to recover in tort from design professionals and the policy reasons for this reluctance are readily applied to this case. Under the facts presented here, it seems the better rule is to follow the reasoning employed in *Berschauer*, where the court declared the importance of maintaining the fundamental boundaries of tort and contract. That court noted that recognizing the boundaries was important so that the allocation of risk and the determination of potential future liability are based on what the parties bargained for in the contract. *Berschauer*, 124 Wn.2d at 826. If the concepts are allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. *Id.*

■ Applying this reasoning to this case, the court's determination that these damages are recoverable from Strata allows the boundaries to overlap. Strata entered a contract with Mr. Sharp and provided a report to him. Even if that report was negligently written or the analysis negligently performed, the allocation of risk lies in the contract between those two parties. The court's conclusion that these claims are recoverable under tort is reversed.

SWEENEY and KATO, JJ., concur.

Reconsideration denied March 2, 2000.