381 F.3d 948
 Don EASTER, Plaintiff, and
John Zacher; Bonnie Zacher, and the marital community composed thereof; on their own behalf and on behalf of all others similarly situated; Gregory Zoro; Jeffrey Stone; Janita Stone, and the marital community composed thereof; Mark Mayfield; Tamara Mayfield, and the marital community composed thereof; James Brown; Margaret Brown, and the marital community composed thereof, on their own behalf and on behalf of all others similarly situated; Paula Scott, Plaintiffs-Appellants,
v.
AMERICAN WEST FINANCIAL, a Nevada Corporation, Defendant, and
Union Financial Corp., a California Corporation; PSB Lending Corporation, a Nevada corporation; Empire Funding Home Loan Owner Trust 1997-1, a Delaware business trust; Empire Funding Home Loan Owner Trust 1997-2, a Delaware business trust; Empire Funding Home Loan Owner Trust 1997-3, a Delaware business trust; Empire Funding Home Loan
 Owner Trust 1997-4, a Delaware business trust; Empire Funding Home Loan Owner Trust 1998-1, a Delaware business trust; Empire Funding Home Loan Owner Trust 1998-2, a Delaware business trust; Empire Funding Home Loan Owner Trust 1998-3, a Delaware business trust; Empire Funding Home Loan Owner Trust 1999-1, a Delaware business trust; Ocwen Federal Bank FSB, a United States savings bank; Tripoint Capitol Corporation, a California Corporation; Argent Mortgage Corporation, a California corporation fka Clearview Capital Corporation; TMS Mortgage Inc., a New Jersey corporation; Financial Asset Securities Corp Mego Mortgage Home Loan Owner Trust 1997-1, a Delaware business trust; Financial Asset Securities Corp Mego Mortgage Home Loan Owner Trust 1997-2, a Delaware business trust; Financial Asset Securities Corp Mego Mortgage Home Loan Owner Trust 1997-3, a Delaware business trust; Financial Asset Securities Corp Mego Mortgage Home Loan Owner Trust 1997-4, a Delaware business trust; FirstPlus Home Loan Owner Trust 1995-3; FirstPlus Home Loan Owner Trust 1995-4; FirstPlus Home Loan Owner Trust 1996-1; FirstPlus Home Loan Owner Trust 1996-2; FirstPlus Home Loan Owner 1996-4; FirstPlus Home Loan Owner Trust 1997-1; FirstPlus Home Loan Owner Trust 1997-2; FirstPlus Home Loan Owner Trust 1997-3; US Bank NA ND; American Mortgage Professionals Inc., a California corporation; FirstPlus Home Loan Owner Trust 1996-3, a Delaware business trust; FirstPlus Home Loan Owner Trust 1997-4, a Delaware business trust; FirstPlus Home Loan Owner 1998-1, a Delaware business trust; FirstPlus Home Loan Owner Trust 1998-2, a Delaware business trust; FirstPlus Home Loan Owner Trust 1998-3, a Delaware business trust; FirstPlus Home Loan Owner 1998-4, a Delaware corporation; FirstPlus Home Loan Owner Trust 1998-5, a Delaware business trust; German American Capital Corporation, a Maryland corporation; Paine Webber Real Estate Securities, Inc., a Delaware corporation; Ace Securities Corporate Home Loan Trust 1999A, a Delaware business trust; Sovereign Bank, a United States savings bank; Real Time Resolutions Inc., a Texas corporation; PB Reit Inc.; PB Investment Corp.; United National Home Loan Owner Trust 1999-1; United National Bank Home Loan Owner Trust 1999-2, Defendants-Appellees.
 No. 03-35041.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 2004.
 Filed August 31, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Christopher I. Brain, Beth E. Terrell, Michael D. Daudt, Toby J. Marshall, Tousley Brain Stephens PLLC, Seattle, Washington, for the appellants.
 Michele Radosevich, Davis Wright Tremaine LLP, Seattle, Washington, for appellees TMS Mortgage, Inc., UBS Warburg Real Estate Securities, Inc.
 James B. Hoff, Bullivant Houser Bailey PC, Seattle, Washington, for appellee American Mortgage Professionals.
 Kevin Bay, Ryan Swanson & Cleveland, PLLC, Seattle, Washington and Antoinette P. Hewitt, Michael J. Mills, Kutak Rock, LLP, Irvine, California, for appellees FirstPlus Home Loan Trust 1996-2, FirstPlus Home Loan Owner Trust 1996-3, FirstPlus Home Loan Owner Trust 1996-4, FirstPlus Home Loan Owner Trust 1997-1, Empire Funding Home Loan Owner Trust 1998-3, Financial Asset Securities Corp. Mego Mortgage Home Loan Owner Trust 1997-1, Mego Mortgage Home Loan Owner Trust 1997-2, Ace Securities Corporate Home Loan Trust 1999A, Real Time Resolutions, Inc., German American Capitol Corporation.
 Richard M. Clinton, Douglas L. Davies, Thuy Nguyen Leeper, Dorsey & Whitney LLP, Seattle Washington, for appellees FirstPlus Home Loan Owner Trust 1997-2, FirstPlus Home Loan Owner Trust 1997-3, FirstPlus Home Loan Owner Trust 1997-4, FirstPlus Home Loan Owner Trust 1998-1, FirstPlus Home Loan Owner Trust 1998-2, FirstPlus Home Loan Owner Trust 1998-3, FirstPlus Home Loan Owner Trust 1998-4, FirstPlus Home Loan Owner Trust 1998-5, Empire Funding Home Loan Owner Trust 1997-1, Empire Funding Home Loan Owner Trust 1997-2, Empire Funding Home Loan Owner Trust 1997-3, Empire Funding Home Loan Owner Trust 1997-4, Empire Funding Home Loan Owner Trust 1998-1, Empire Funding Home Loan Owner Trust 1998-2, Empire Funding Home Loan Owner Trust 1999-1, U.S. Bank National Association, N.D., Financial Asset Securities Corp. Mego Mortgage Home Loan Owner Trust 1997-3, Financial Asset Securities Corp. Mego Mortgage Home Loan Owner Trust 1997-4, GRMT Mortgage Loan Trust 2001-1, co-counsel for PSB Lending Corporation.
 Jeffrey S. Miller, Foster Pepper & Shefelman PLLC, Seattle, Washington, for Ocwen Federal Bank, FSB.
 J. William Ashbaugh, Kenneth Hobbs, Seattle, Washington, for PB REIT, Inc., PB Investment Corporation.
 Appeal from the United States District Court for the Western District of Washington, Barbara Jacobs Rothstein, District Judge, Presiding. D.C. Nos., CV-01-01004-BJR, CV-01-01028-BJR and CV-01-01043-BJR.
 Before: TASHIMA, PAEZ, and BEA, Circuit Judges.
 BEA, Circuit Judge:
 
 I. Introduction
 
 1
 Washington's usury statute prohibits ordinary lenders from making loans bearing interest rates in excess of 12%. WASH. REV. CODE § 19.52.020. However, Washington's Consumer Loan Act (CLA) permits licensed lenders to charge interest rates up to 25% to borrowers with less than perfect credit. WASH. REV. CODE §§ 31.04.005, 31.04.035, 31.04.105. Washington also limits by statute the amount of origination fees a lender may charge. WASH. REV. CODE §§ 19.52.020, 31.04.035.
 
 
 2
 In the second-mortgage market, the identity of the actual lender is not always clear. This case deals with whether old usury laws have caught up with modern practices in lending, intermediating, discounting, and sales.
 
 
 3
 Put another way, have the brokers and lenders involved here structured their transactions so clearly that there remain no triable issues of fact whether unlicensed lenders made the loans? As discussed below, we conclude that in certain instances they have, in others they have not. However, we also conclude that on some claims in which such triable issues remain, the plaintiffs-appellants' (Borrowers) claims are time-barred by the applicable statutes of limitation. Accordingly, we will affirm in part and will reverse in part the orders of the district court, and will remand for further proceedings.
 
 II. Factual and Procedural Background
 
 4
 Borrowers obtained residential second mortgage loans at interest rates greater than 12% from Union Financial Company (Union) or American Mortgage Professionals, Inc. (AMP). After Borrowers executed the loan documents, Union assigned the loans to Empire Funding Corporation (Empire) and TMS Mortgage, Inc. d/b/a The Money Store (TMS); AMP assigned the loans to FirstPlus Financial, Inc. (FirstPlus). Empire, TMS, and FirstPlus later sold the loans to various investment trusts (collectively, Trust Defendants) which pooled the loans together, securitized the loans into trusts, and sold interests in the trusts to investors.
 
 
 5
 Zacher v. Union Financial Company, D.Ct. No. CV-01-01043-BJR, and Stone v. American Mortgage Professionals, Inc., D.Ct. No. CV-01-01028-BJR, are the two lead cases in a group of putative class actions with similar allegations that were originally filed in King County Superior Court, Washington. Borrowers' complaints both allege that defendants violated Washington state usury and consumer protection laws. Invoking diversity jurisdiction, defendants in each action removed all putative class actions to federal court. The district court consolidated the actions, designated the lead actions, and stayed the others.
 
 A. Claims Against Union and AMP
 
 6
 The complaints[1] allege causes of action for (1) statutory usury; (2) violations of Washington's Consumer Protection Act (CPA);[2] (3) negligence; and (4) common law usury. Borrowers contend that their loans were usurious because Union and AMP were not licensed by the state of Washington to charge interest in excess of 12%. They further allege that, as assignees of the loans, TMS and the Trust Defendants are subject to all claims and defenses that Borrowers may assert against Union and AMP.
 
 
 7
 Defendants contend that, as loan brokers, Union and AMP did not need licenses under the CLA because they were not lending their own money. They contend that in each of the loans at issue, Union and AMP acted only as brokers because each loan was "table-funded" by Empire, TMS, or FirstPlus, each of whom was licensed under the CLA to charge interest rates up to 25%.
 
 
 8
 "Table-funding" is defined as a "settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." See, e.g., 24 C.F.R. § 3500.2.[3] In a table-funded loan, the originator closes the loan in its own name, but is acting as an intermediary for the true lender, which assumes the financial risk of the transaction. The timing of the assignment is therefore sometimes pivotal in determining whether a residential mortgage loan is table-funded because the determinative question is who bears the risk of the transaction.
 
 
 9
 On August 7, 2002, the district court granted defendant-appellee TMS's motion for summary judgment in Zacher. In its order, the court "conclude[d] that plaintiffs have not established a prima facie case of usury or negligence under Washington state law."
 
 
 10
 Reviewing Washington statutes and case law, the court held that a loan broker may close a loan in its own name at an interest rate greater than 12%, so long as the loan is table-funded and the party that provides the money for the loan is licensed under the CLA. The court found that there was no genuine issue of material fact as to whether the loans in the Zacher case were table-funded and granted summary judgment on all claims.
 
 
 11
 On August 29, 2002, the district court entered an order granting summary judgment in favor of AMP against all plaintiffs except Paula Scott in Stone. The district court held that — with the exception of Scott's loan — there was no genuine issue of material fact as to whether any of Borrowers' loans had been table-funded. The district court denied AMP's motion for summary judgment on Scott's claims, finding an issue of fact as to whether her loan was table-funded.[4]
 
 B. Claims Against Trust Defendants
 
 12
 Borrowers also contend that, as successor holders of the allegedly usurious loans, the Trust Defendants are jointly and severally liable for the state law violations of Union and AMP. They do not allege that the Trust Defendants have any direct liability for their actions with respect of the origination of the loans; it is clear that the Trust Defendants played no part in such loan originations.
 
 
 13
 The Trust Defendants filed a joint motion to dismiss or for summary judgment contending that Borrowers lacked standing to sue any trust defendant who had not held a named plaintiff's loan, the district court lacked personal jurisdiction over the Trust Defendants, the applicable statutes of limitation barred Borrowers' claims, and Washington's economic loss rule[5] barred Borrowers' negligence claims.
 
 
 14
 On August 29, 2002, the district court granted summary judgment in favor of all Trust Defendants, holding that it lacked personal jurisdiction over each Trust Defendant. The district court concluded that the Trust Defendants had insufficient contacts with Washington and that Borrowers lacked standing to sue any Trust Defendant which had not held a named plaintiff's loan.
 
 
 15
 On December 19, 2002, the district court entered an order certifying for immediate appeal under Federal Rule of Civil Procedure 54(b) its three orders granting summary judgment: (1) the August 7, 2002 order in Zacher; (2) the August 29, 2002 order in Stone granting summary judgment in favor of AMP on the claims of all plaintiffs except Scott;[6] and (3) the August 29, 2002 order granting summary judgment in favor of all Trust Defendants. We have jurisdiction under 28 U.S.C. § 1291 to review these final orders of the district court.
 
 III. Standards of Review
 
 16
 We review de novo the district court's grant of a motion for summary judgment, United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003); a district court's determination of standing, Gospel Missions of America v. City of Los Angeles, 328 F.3d 548, 553 (9th Cir.2003), personal jurisdiction, Dole Food Co. v. Watts, 303 F.3d 1104, 1108 (9th Cir.2002), and the interpretation of a statute, Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870 (9th Cir.2001) (en banc).
 
 
 17
 In reviewing an order granting a summary judgment, we view the evidence in the light most favorable to the nonmoving party and determine whether there is any genuine issue of material fact. City of Tacoma, 332 F.3d at 578; FED. R. CIV. P. 56. Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues. Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936, 680 F.2d 594, 598 (9th Cir.1982). We also review de novo whether the district court correctly applied the substantive law. City of Tacoma, 332 F.3d at 578.
 
 IV. Discussion
 
 18
 A. Summary Judgment in Favor of Loan Originating Defendants
 
 
 19
 The primary issue with respect to the loans in these cases is whether Union and AMP were lenders or were simply acting as brokers for TMS, Empire, and FirstPlus. A lender is one who puts money at risk. The touchstone for decision here is whether licensed or unlicensed parties were placing their own money at risk at any time during the transactions. The distinction is crucial because Union and AMP were not licensed under the Washington CLA at the time of the transactions at issue. If they were lenders, with their own money at risk of Borrowers' default, then their loans would be in violation of the usury statute. However, if they were acting merely as brokers, placing only their licensed principals' money at risk, no such violation occurred.
 
 
 20
 In its August 7, 2002 order granting summary judgment in favor of Union and TMS, the district court relied on Washington case law to apply a three-part test to determine whether a loan originator who closes a loan in its own name is a broker or a lender. Citing National Bank of Commerce of Seattle v. Thomsen, 80 Wash.2d 406, 495 P.2d 332 (1972), the district court found the following criteria to be determinative of a loan originator's status as a broker, rather than a lender: "(1) whether the originator had a pre-existing relationship with the lender, such as a credit line; (2) whether the originator received funds from the lender before or after it dispersed them to the borrower; and (3) whether the borrower was apprized of the type of agreement into which he entered." We hold that the district court correctly interpreted Washington law to conclude that a broker who table-funds a loan for the actual lender is not a lender in the transaction and need not be licensed under the CLA's licensing requirement.
 
 
 21
 
 1. Washington Courts Look To The Substance, Not The Form, Of A Transaction To Determine Whether It Is Usurious
 
 
 
 22
 Washington courts consistently look to the substance, not the form, of an allegedly usurious transaction. For example, in Simpson v. C.P. Cox Corp., 167 Wash. 34, 8 P.2d 424 (1932), the Washington Supreme Court affirmed a judgment in favor of the lender plaintiff and held that a note was not usurious where the defendants had agreed to repay $3,000 at 7% interest and grant the plaintiff a guaranteed profit of $500. The plaintiff had advanced $3,000 to the defendants for a business venture and received in return a 90-day promissory note for $3,500 (principal plus the $500 guaranteed profit) payable at 7%. The defendants contended that the $500 should be included in the calculation of the interest, which would render the rate on the note greater than the maximum allowable rate of 12%.
 
 
 23
 The trial court granted judgment for the plaintiff, holding that the transaction was a joint venture and the $500 was a guaranteed profit, not hidden interest. In affirming, the Washington Supreme Court stated: Since usury laws are quasi-penal, the courts will not hold a contract to be in violation of the usury laws unless upon a fair and reasonable construction of all of its terms, in view of the dealings of the parties, it is manifest that the intent of the parties was to engage in such a transaction as is forbidden by those laws.... In short ... the contract is not usurious when it may be explained on any other hypothesis.
 
 
 24
 Id. at 425 (internal quotation marks and citation omitted).
 
 
 25
 Again, in Clausing v. Virginia Lee Homes, Inc., 62 Wash.2d 771, 384 P.2d 644, 646 (1963), the Washington Supreme Court examined the substance not the form of the transaction to find that the loan was usurious. There, the defendants had contracted for a residential mortgage loan and signed a promissory note in the amount of $67,500 at 5% interest. Id. at 646. The plaintiff provided the defendants with a cash payment of $56,200 after deducting expenditures. Id. Thereafter, the parties signed an agreement changing the repayment terms and a promissory note backdated to the date of the original note, but extending the repayment period. Id.
 
 
 26
 After the defendants defaulted, the plaintiff sued on the note. Id. at 645. The defendants contended the original note was usurious. Id. The trial court entered judgment for the plaintiffs, but found the note usurious and calculated damages according to the principles set forth in the usury statute. Id.
 
 
 27
 The Washington Supreme Court affirmed, applying the principle that "in cases involving alleged usury the law ... searches for the real transaction between the parties...." Id. at 646. It found that the loan was actually for the amount of the cash payment and that the difference between the amount received and the face value of the note was hidden interest, which rendered the actual rate on the note in excess of 12%. Id. at 647. The superceding note with its extended repayment period was insufficient to purge the usury of the first note. Id. at 646-47.
 
 
 28
 The district court derived the three-part test noted above from National Bank of Commerce and McCall v. Smith, 184 Wash. 615, 52 P.2d 338 (1935). In National Bank of Commerce, the plaintiff, National Bank, sued to recover installment payments owed on a new car. Defendant had purchased a new car with a down payment of approximately half the purchase price and agreed with the car dealer to pay a "time price differential" on the amount financed. He later refused to make further payments. Nat'l Bank of Commerce, 495 P.2d at 334-35.
 
 
 29
 Plaintiff asserted that the credit sale was pursuant to a conditional sales contract, which was exempt from the usury statute. Defendant asserted that the contract was usurious because the "time price differential" on the sale amounted to 14.61% interest, in excess of the 12% statutory maximum. Id. The trial court held that the contract was an exempt conditional sales contract, not a loan. Id. at 335. The Washington Supreme Court reversed the trial court finding that the contract was actually a loan, and therefore subject to the usury statute. Id. at 339.
 
 
 30
 The car dealer and National Bank had a preexisting relationship, the contract stated that the obligation was to National Bank, and the car dealer assigned the contract to National Bank two days after Thomsen executed it (because Thomsen executed the contract on a Saturday, so the intervening day was a Sunday). Id. at 334. Therefore, the court held that the contract was a loan from the bank, not a sale on credit by the car dealer. Id. at 337. "The party who furnished the money with which the purchase is made and to whom the purchaser obligates himself to repay that money is a lender." Id.
 
 
 31
 In McCall, plaintiff sued to recover on a promissory note and foreclose on the real estate mortgage securing it. Defendant asserted a usury defense. According to the Washington Supreme Court, "the principal question in dispute is whether [the broker] agreed to loan, and eventually did loan, its own money to appellants, or whether it acted as a broker for appellants in securing the loan from a third party." McCall, 52 P.2d at 339. Although the note at issue was in the name of the broker, the broker assigned it to the lender on the day it was executed and the borrower knew that it was for the account of the lender, not the broker. Id.
 
 
 32
 The borrower contended that the broker was the lender and therefore the amount of the commission should be considered hidden interest. Id. at 341. The Washington Supreme Court affirmed the trial court's determination that the note was not usurious because the broker had not acted as the lender. Id. Once the amount of the broker's commission was deducted from the calculation of interest on the loan, the rate was not usurious.
 
 
 33
 Washington usury law with respect to determining the identity of a lender shows that the party that provides the funds is the lender. Where a broker who is not licensed under Washington's CLA closes a loan in its own name, but the loan is actually funded by a licensed lender, the broker does not violate Washington's usury statute.
 
 
 34
 
 2. There Are Genuine Issues Of Material Fact As To Whether Some Of These Loans Were Table-funded.
 
 
 
 35
 Although the district court properly interpreted Washington state law, it erred in its application of the National Bank of Commerce three-part test to the loans in question made to the Zachers, the Stones, and the Browns. Genuine issues of material fact remain with respect to the source of funding for the Zachers' loan, and with respect to whether the Stones and the Browns were apprised that their loans would be assigned or discounted, thereby effecting a transfer of the obligation to a creditor other than the originating broker.
 
 
 36
 
 a. Loan Transactions in Zacher v. Union Financial
 
 
 
 37
 The district court properly granted summary judgment on Zoro's claims. There is no dispute that TMS and Union had a pre-existing relationship. Union did not send Zoro his checks until August 13, 1997, a day after it received money from TMS on August 12, 1997. Zoro received a letter dated the same day that he signed the promissory note which informed him that his loan was being assigned to TMS. Thus, all the elements of the test are met with respect to Zoro's loan, and summary judgment in favor of defendants-appellees was proper.
 
 
 38
 However, there is a genuine issue of material fact as to whether Union used its own funds to deliver the money on the Zachers' loan before it received the transfer from Empire. The district court therefore erred in granting summary judgment on the Zachers' claims. Union paid the Zachers' $40,000 loan with checks drawn on Union's account, dated September 8, 1997. Union received a $40,000 wire transfer from Empire on September 10, 1997, two days after the checks to the borrowers were dated. There is no evidence in the record of when Union actually delivered the checks to the Zachers other than the checks themselves.
 
 
 39
 Thus, the evidence is susceptible to the inference that Union paid the Zachers with Union's own money before Union received the transfer from Empire. Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues. Sherman Oaks, 680 F.2d at 598.
 
 
 40
 
 b. Loan Transactions in Stone v. AMP
 
 
 
 41
 AMP's president presented undisputed deposition testimony that established AMP had a preexisting relationship with FirstPlus. Thus, this element of the district court's test is met for all Borrowers suing AMP. Similarly, the undisputed affidavit of AMP's president established that AMP assigned each loan to FirstPlus shortly after its execution and "contemporaneously with loan funding." The checks payable to the Stones and the Mayfields are dated after AMP assigned their loans to FirstPlus. Thus, there is no issue of fact as to whether AMP used its own money; it did not.
 
 
 42
 However, there is no evidence to show that either the Stones or the Browns were apprised that their loans would be assigned from AMP to FirstPlus. Thus, AMP failed to establish this element of the test, and there is a genuine issue of material fact as to whether the Stones and the Browns were apprised of the assignment at the time that they executed their loan documents. The district court thus erred in granting summary judgment on their claims.
 
 
 43
 The district court correctly granted summary judgment on the Mayfields' claims. Mayfield testified in deposition that he knew his loan was being assigned; he did not object. Thus all elements of the test are met and there is no genuine issue of material fact as to whether AMP table-funded the Mayfields' loan.
 
 
 44
 B. Summary Judgment in Favor of Trust Defendants
 
 
 45
 
 1. The District Court Erred In Holding That The Trust Defendants Are Not Subject To Personal Jurisdiction
 
 
 
 46
 We begin a jurisdictional analysis by looking to the state statute authorizing its courts to exercise jurisdiction over out of state defendants. Washington's long-arm statute, section 4.28.185 of the Washington Revised Code, permits the exercise of jurisdiction to the full extent of the due process clause of the United States Constitution. Shute v. Carnival Cruise Lines, 113 Wash.2d 763, 783 P.2d 78, 79-80 (1989), rev'd on other grounds by Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). Under the due process analysis, a defendant may be subject to either general or specific personal jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 & n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
 
 
 47
 
 a. General Jurisdiction
 
 
 
 48
 A defendant is subject to general jurisdiction only where the defendant's contacts with a forum are "substantial" or "continuous and systematic." Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir.2000). The Trust Defendants submitted uncontroverted evidence that they have no offices, employees, or bank accounts in Washington, do not conduct business in Washington, and have not contracted with any Washington resident. Accordingly, the district court correctly found that the Trust Defendants are not subject to general personal jurisdiction in Washington.
 
 
 49
 
 b. Specific Jurisdiction
 
 
 
 50
 Specific jurisdiction applies if "(1) the defendant has performed some act or consummated some transaction within the forum state or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable." Bancroft & Masters, 223 F.3d at 1086.
 
 
 51
 Here, the Trust Defendants have availed themselves of the protections of Washington law because they are beneficiaries of deeds of trust, which hypothecate Washington realty to secure payments on notes owned by the Trust Defendants. The deeds of trust convey a property interest in Washington realty, which interest the Trust Defendants expect Washington law to protect. In Sher v. Johnson, 911 F.2d 1357, 1363 (9th Cir.1990), this court noted that holding a deed of trust "represents a significant contact with [the forum]."[7] The Trust Defendants also receive money from Washington residents, albeit routed through the loan servicing companies who actually bill the payors. The Trust Defendants' income stream is derived from loans negotiated and executed in Washington and made to Washington residents.
 
 
 52
 Moreover, Borrowers' actions arise out of the Trust Defendants' contacts with the forum because the suit is for recovery of the allegedly excessive interest payments Borrowers made on their notes. Defendants bear the burden of proving that the exercise of jurisdiction would be unreasonable. Bancroft & Masters, 223 F.3d at 1088. They have produced no evidence to show that exercise of jurisdiction over them would fail to "comport with fair play and substantial justice." Id. Therefore, the district court erred in finding that it lacked specific personal jurisdiction over the Trust Defendants and we reverse the district court's order on this ground.
 
 
 53
 
 2. The District Court Properly Found That Borrowers Lack Standing To Sue Some Trust Defendants
 
 
 
 54
 
 a. Borrowers Cannot Establish Traceability to Trust Defendants Other Than Those Who Hold A Named Plaintiff's Note
 
 
 
 55
 With respect to those Trust Defendant that do not hold a named plaintiff's note, we affirm the district court's ruling that "plaintiffs have failed to link their causes of action with specific actions of the 39 Trust defendants" and therefore lack standing to sue. Constitutional standing requires a plaintiff to demonstrate: (1) an injury in fact; (2) traceability, i.e., a causal connection between the injury and the actions complained of; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
 
 
 56
 To satisfy the traceability requirement, a class action plaintiff must "allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Here, no named plaintiff can trace the alleged injury in fact-payment of usurious interest rates-to all of the Trust Defendants, but only to the Trust Defendant that holds or held that plaintiff's note. As to those trusts which have never held a named plaintiff's loan, Borrowers cannot allege a traceable injury and lack standing.
 
 
 57
 
 b. The District Court Properly Considered Standing Before Class Issues
 
 
 
 58
 The district court correctly addressed the issue of standing before it addressed the issue of class certification. Borrowers contend that Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) requires courts to consider class certification before addressing standing issues. Although the court in Fibreboard examined class issues before the question of Article III standing, it did so in the very specific situation of a mandatory global settlement class. Fibreboard does not require courts to consider class certification before standing. See id. at 831, 119 S.Ct. 2295 (noting that a "court must be sure of its own jurisdiction before getting to the merits").
 
 
 59
 
 c. There Is No "Juridical Link" To Confer Standing On Borrowers
 
 
 
 60
 Relying on LaMar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir.1973), Borrowers contend that the Trust Defendants are all "juridically linked" and therefore the named plaintiffs have standing to sue each Trust Defendant on behalf of the class. In LaMar, the Ninth Circuit held that a plaintiff having a cause of action against one defendant could not represent a class with actions against defendants who had behaved similarly but had not injured the plaintiff.
 
 
 61
 The court based its ruling on the requirements of Federal Rule of Civil Procedure 23, holding that such a plaintiff could not satisfy the "typicality" or the "fair and adequate representation" elements of class certification. Id. at 465-66. However, the court stated that a plaintiff might be able to satisfy the class requirements where "all injuries are the result of a conspiracy or concerted schemes between the defendants" or where "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." Id. at 466.
 
 
 62
 Here, Borrowers presented no evidence that their alleged injuries were the result of a conspiracy or concerted scheme between the Trust Defendants. To the contrary, the Trust Defendants are competitors for the purchase of secured loans in the same market place. Nor are the Trust Defendants related governmental entities, the other situation contemplated by the La Mar court. La Mar, 489 F.2d at 469-70 (noting that the facts before it did not concern a "common rule applied by instrumentalities of a single state"). The Trust Defendants are not juridically linked, and Borrowers cannot acquire standing to sue those defendants who do not now hold and have never held a named plaintiff's loan through the juridical links doctrine.
 
 
 63
 
 d. Borrowers' Remaining Contentions Regarding Standing Are Without Merit
 
 
 
 64
 Borrowers contend that the Home Owners Equity Protection Act of 1994 (HOEPA), 15 U.S.C. § 1641(d) confers joint and several liability on all Trust Defendants and therefore creates a juridical link between them. HOEPA states that an assignee of a mortgage "shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage...." 15 U.S.C. § 1641(d)(1). Nothing in the language of HOEPA purports to confer standing on a plaintiff to sue a defendant against whom that plaintiff cannot otherwise assert a cause of action. Nor does the possible imposition of joint and several liability on an assignee create a juridical link between an assignee and other unrelated parties. Borrowers have failed to demonstrate that they have injuries in fact traceable to those Trust Defendants who never held a named plaintiff's loan. The district court correctly held that HOEPA does not confer standing against the Trust Defendants who did not hold their loans.
 
 
 65
 Borrowers also contend that the district court erred in dismissing the Trust Defendants for lack of standing because they may be permissively joined as parties under FED. R. CIV. P. 20. The Federal Rules of Civil Procedure do not create standing in a plaintiff who otherwise lacks it and this contention is without merit. FED. R. CIV. P. 82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States district courts....").
 
 C. Statutes of Limitation
 
 66
 Although we hold above that there are genuine issues of material fact with respect to whether certain of the transactions were table-funded, we may affirm the district court's judgment on any ground supported by the record. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097 (9th Cir.2003). Of those claims that survive the summary judgment analysis above, some are barred by the applicable statutes of limitation.[8]
 
 
 67
 A statutory usury claim in Washington is subject to a six-month statute of limitation which begins to run when the loan is either paid in full or when the final payment is due. WASH. REV. CODE § 19.52.032. The Zachers, Stones, and Browns all paid off their loans in full more than six months before May 25, 2001, the date on which Borrowers filed these complaints. Therefore, their statutory usury claims are untimely.
 
 
 68
 A Washington common law usury claim is subject to a three-year statute of limitation, Flannery v. Bishop, 81 Wash.2d 696, 504 P.2d 778, 781 (1972), and "accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action," Allen v. State, 118 Wash.2d 753, 826 P.2d 200, 203 (1992). The limitation period on an action to recover illegal interest runs from the time of each payment because that is the date on which the obligation to repay arises. City of Seattle v. Walker, 87 Wash. 609, 152 P. 330, 331-32 (1915).
 
 
 69
 The Browns made their last payment in September 1997, more than three years before the complaint was filed, and their common law usury claim is therefore time-barred. The Stones made their last payment in October 1998 and the Zachers made their last payment before August 1998. Therefore their common law usury claims are barred as to any payments made more than three years before their complaints were filed.
 
 
 70
 Washington has a three-year statute of limitation for negligence actions. WASH. REV. CODE § 4.16.080. A negligence cause of action accrues when the plaintiff knows or should know all the facts giving rise to the cause of action. Gevaart v. Metco Const., Inc., 111 Wash.2d 499, 760 P.2d 348, 349 (1988). Borrowers knew all the facts giving rise to claims based on the allegedly usurious loans at the time they contracted the loans. Thus, the Zachers', the Stones', and the Browns' negligence claims are barred by the three-year statute of limitation.
 
 
 71
 Washington imposes a four-year statute of limitation on CPA claims. WASH. REV. CODE § 19.86.120. Under Washington case law, the CPA applies to acts that induce plaintiffs to enter into their contracts. See Johnston v. Beneficial Mgt. Corp. of Am., 85 Wash.2d 637, 538 P.2d 510, 515 (1975). Accordingly, the CPA's four-year statute of limitation operates to bar the Stones' and the Browns' CPA claims, because they knew at the time they closed their loans the facts necessary to state both their usury cause of action and the CPA claim. However, this rule does not bar the Zachers' CPA claim because they filed suit less than four years after contracting their loan.
 
 V. Conclusion
 
 72
 We conclude that the district court properly interpreted Washington state law to find that a broker who arranges a table-funded loan need not be licensed under the CLA. We affirm in part and reverse in part the district court's August 7, 2002 order granting summary judgment in Zacher v. Union Financial. We affirm the grant of summary judgment against Zoro, and affirm on other grounds the grant of summary judgment on the Zachers' statutory usury and negligence claims and part of their common law usury claim. We reverse the district court's summary judgment on the Zachers' CPA claim and their common law usury claim for payments made after May 25, 1998.
 
 
 73
 We also affirm in part and reverse in part the district court's August 29, 2002 order in Stone v. AMP. We affirm the grant of summary judgment against the Mayfields on the basis that their loan was table funded. With respect to the Browns, the district court erred in finding no genuine issue of material fact, but we affirm the summary judgment because their claims are barred by the applicable statutes of limitation. Although there is a genuine issue of material fact as to whether the Stones' loan was table-funded, we affirm on statute of limitation grounds, except as to their common law usury claim for payments made after May 25, 1998.
 
 
 74
 We affirm in part and reverse in part the district court's August 29, 2002 order granting summary judgment in favor of all Trust Defendants. As discussed above, the district court erred in finding that it lacked personal jurisdiction over the Trust Defendants, and we reverse that portion of the order. However, we affirm the district court's ruling that the named plaintiffs lack standing to sue any Trust Defendant which did not hold a named plaintiff's loan. We dismiss the appeal as to any appeal by plaintiff Paula Scott because none of the rulings on her claims is properly before us. See footnotes 3, 5, supra. Each party shall bear its own costs on appeal.
 
 
 75
 DISMISSED in part, AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 In this opinion, "complaint" refers to the last amended complaint in each case
 
 
 [2]
 WASH. REV. CODE §§ 19.86.010,et seq.
 
 
 [3]
 Because the loans at issue are residential mortgage loans within the scope of the Real Estate Settlement Practices Act, 12 U.S.C. §§ 2601et seq., the definition of table-funding promulgated by the Department of Housing and Urban Development applied at loan origination. See 12 U.S.C. § 2602(1). In addition, the Washington Department of Financial Institutions, which licenses lenders under the CLA, has used the HUD definition of table-funding in its correspondence with the defendants in these cases.
 
 
 [4]
 We do not review the denial of summary judgment on Scott's claims because it is not a final orderSee Carey v. Nev. Gaming Control Bd., 279 F.3d 873, 877 n. 1 (9th Cir.2002); 28 U.S.C. § 1291.
 
 
 [5]
 Washington's economic loss rule prohibits a plaintiff from recovering tort damages on a cause of action arising out of contractual obligationsSee, e.g., Hofstee v. Dow, 109 Wash. App. 537, 36 P.3d 1073, 1076 (2001) (affirming dismissal of negligence claim where plaintiff had purchased cattle which were slaughtered after testing positive for brucellosis because plaintiff's remedy was in contract, not tort).
 
 
 [6]
 On October 25, 2002 the district court granted in part and denied in part AMP's motion for reconsideration of the denial of summary judgment as to Scott and entered summary judgment in favor of AMP on Scott's statutory usury claim. However, Borrowers did not move under Rule 54(b) to certify the order granting in part the motion for reconsideration; hence, the district court did not certify that order for immediate appeal. Scott's claim is not before us
 
 
 [7]
 TheSher panel declined to rule on whether a recorded deed of trust alone would be a sufficient contact to support personal jurisdiction. Id. Because the Trust Defendants receive an income stream from Washington residents, we also have no occasion to rule on whether the deeds of trust alone would support personal jurisdiction. We simply note that they are a significant contact with the state and that, combined with the income derived from Washington residents, they show that the Trust Defendants have purposefully availed themselves of the privilege of doing business in Washington, as to the secured credit transactions here related.
 
 
 [8]
 Borrowers' contention that defendants fraudulently concealed the usurious nature of their loans so as to toll any statutes of limitation is without merit. "Fraudulent concealment necessarily requires active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time."Santa Maria v. Pac. Bell, 202 F.3d 1170, 1177 (9th Cir.2000). If it did not, "the tolling doctrine [would merge] with the substantive wrong, and would virtually eliminate the statute of limitations" unless the defendant informs the plaintiff of the wrong at the time it occurs. Id. Borrowers' complaints fail to allege any active concealment beyond the wrongs sued upon.